[Cite as *Chicago Cycles Inc. v. GE Capital*, 2013-Ohio-425.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| CHICAGO CYCLES, INC., ET AL., | ) | |
| | ) | |
| PLAINTIFFS-APPELLANTS, | ) | |
| | ) | |
| V. | ) | CASE NO. 12 MA 29 |
| | ) | |
| GE CAPITAL CONSUMER CREDIT | ) | OPINION |
| CARD CO., | ) | |
| | ) | |
| DEFENDANT-APPELLEE. | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 09CV2006

JUDGMENT: Affirmed

APPEARANCES:
For Plaintiffs-Appellants            Attorney Scott J. Orille
                                     The Galleria & Towers at Erieview
                                     1301 East Ninth Street, Suite 2200
                                     Cleveland, Ohio 44114

For Defendant-Appellee               Attorney John J. Rutter
                                     222 South Main Street
                                     Akron, Ohio 44308

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite

Dated: February 5, 2013

[Cite as *Chicago Cycles Inc. v. GE Capital*, 2013-Ohio-425.]
DONOFRIO, J.

{¶1} Plaintiff-appellant, Chicago Cycles, Inc., appeals from a Mahoning County Common Pleas Court judgment awarding judgment to defendant-appellee, GE Money Bank, following a bench trial on Chicago Cycles' claim that appellee wrongfully seized funds belonging to it through a contractual "chargeback" right and also awarding judgment in favor of GE Money Bank on its counterclaim for chargeback.

### The Parties

{¶2} Appellee GE Money Bank (GE) is the successor by merger with GE Capital Consumer Credit Card Company. Through its power sports division, GE provides financing for consumers to purchase power sports products, such as motorcycles and all-terrain vehicles, through authorized dealers.

{¶3} Andrews Cycles operated a power sports dealership in Salem, Ohio as W.W. Cycles. Giant Motorsports, Inc. was W.W. Cycles' parent company. Giant Motorsports acquired Appellant Chicago Cycles, Inc. (CCI), a power sports dealership in Chicago, Illinois, in 2004. Andrews Cycles is no longer a party to this litigation.

### The Dealership Agreements

{¶4} GE entered into "dealership agreements" with CCI whereby CCI would make GE's lending programs available to its customers. Provided by GE, CCI offered its customers three separate lending programs: the Honda Card; the Honda FUNancing Card; and a Yamaha installment loan plan. The Honda Card and the FUNancing Card were revolving credit cards with instant in-store credit application and approval. A potential buyer could walk into CCI, submit a credit card application, and obtain immediate credit to purchase a motorcycle/all-terrain vehicle. After the buyer used the credit card to buy a power sports vehicle, CCI would then submit a "credit memo" to GE in the amount that the buyer charged to the new credit card. GE would then pay CCI that amount.

{¶5} Under the terms of the dealership agreements, if a buyer financed a purchase of $5,000 or more, CCI was to identify GE as a lienholder on the certificate

of title. Additionally, the lending programs were to be used solely for "bona fide consumer purchases." In other words, the purchases were to be for personal and not commercial use. Furthermore, the Honda Card and FUNancing Card were not to be used for down payments. The dealership agreements entitled GE to chargeback the amount of a credit memo, plus interest on the unpaid balance, if GE determined that CCI violated the terms of the dealership agreement or if a credit memo was fraudulent or was not submitted in relation to a bona fide consumer purchase.

## Split-Tickets

{¶6} Certain purchases of power sports vehicles at CCI were made using "split-ticket" transactions. A split-ticket occurs when the dealership splits the total value of the sale into two or more smaller transactions using two or more financing programs. This enables the buyer to circumvent the lien on the vehicle. For instance, if the purchase price of a vehicle is $6,000, it is split into two $3,000 payments, one payment on a Honda Card and one on a FUNancing Card. Because there is no purchase transaction for $5,000 or more, GE does not expect to have a lien on that vehicle's title. GE contends that such split-tickets are in violation of the dealership agreements.

## Chargebacks

{¶7} Between June 2007 and August 2008, nine buyers at CCI collectively opened 17 GE financing accounts, which they used to purchase 48 vehicles. These purchases totaled approximately $324,000.00. These accounts were brought to GE's attention by law enforcement officials. GE claims that through investigation, it found that CCI sold multiple vehicles using split-tickets, many of these purchases were within days of each other and involved the same makes and models of vehicles, giving rise to GE's belief that these transactions were not bona fide consumer transactions. Consequently, after receiving no explanation for these sales from CCI, GE exercised its chargeback option and seized/recovered $132,554.10 from CCI.

## The Lawsuit

**{¶8}** CCI filed a complaint against GE on May 29, 2009, alleging breach of contract and conversion, and requesting a declaratory judgment. GE filed a counterclaim for chargeback and indemnification. GE asserted that it was still entitled to chargeback another $35,462.80.

**{¶9}** The matter proceeded to a bench trial before a magistrate. The magistrate issued a 41-page decision. He found that on CCI's breach of contract claim relating to the Honda Card and the FUNancing Card, CCI failed to demonstrate that it fulfilled its contractual obligations to GE under the dealership agreements. Instead, the magistrate found that CCI breached various terms in the dealership agreements. The magistrate further found that CCI failed to demonstrate that GE did not fulfill its contractual obligations to CCI. He found the evidence demonstrated that GE properly exercised its chargeback rights. Additionally, the magistrate found that on CCI's breach of contract claim relating to the Yamaha dealership agreement, CCI failed to present any evidence that GE made any recovery, through chargeback or otherwise, under that contract. The magistrate went on to find CCI could not recover for a breach of the implied duty of good faith because each of the dealership agreements specifically set out GE's chargeback rights. The magistrate further determined CCI's claim for conversion failed because the chargeback provisions in the dealership agreements created a right for GE to exercise control over funds "otherwise payable" to CCI under the applicable program if GE determined CCI breached the dealership agreement. Finally, as to GE's counterclaim for breach of contract, the magistrate found GE demonstrated that CCI failed to fulfill its obligations under the dealership agreements. Thus, the magistrate found that judgment should be entered against CCI in the amount of $35,462.80 on GE's counterclaim.

**{¶10}** CCI filed objections to the magistrate's decision arguing the magistrate erroneously determined that GE properly availed itself of its chargeback remedy, that the evidence demonstrated that GE failed to satisfy its contractual obligation to tender to CCI the consumer credit agreements to which the seized funds were applied, and that GE authorized the use of split-ticket transactions.

{¶11} The trial court, finding no error of law or fact with the magistrate's decision, adopted the decision and entered judgment accordingly. Thus, the court dismissed CCI's claims for breach of contract and conversion. It entered a declaratory judgment (1) that GE lawfully charged back the sum of $132,554.10 against CCI pursuant to GE's rights under the Honda Dealer Agreement and the FUNancing Dealer Agreement; (2) that GE's receipt of a $117,573.16 indemnification payment from American Honda was not in contravention of CCI's rights; and (3) denying CCI's demand for attorney's fees and costs. Finally, the court entered judgment in favor of GE on its counterclaims for chargeback and indemnification in the amount of $35,462.80, plus costs.

{¶12} CCI filed a timely notice of appeal on February 17, 2012.

{¶13} CCI raises three assignments of error. The first two assignments of error raise the same issue. Therefore, we will address them together. They state:

THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO ADDRESS OR CONSIDER THE CONTRACTUAL DUTIES GE MONEYBANK MUST PERFORM IN ORDER TO EXERCISE ITS CHARGE-BACK RIGHT.

THE TRIAL COURT ERRED IN FINDING THAT GE MONEYBANK LAWFULLY EXERCISED ITS CHARGE-BACK RIGHT WHEN THE UNDISPUTED FACTS DEMONSTRATED THAT GE DID NOT SATISFY ITS CORRESPONDING CONTRACTUAL OBLIGATIONS.

{¶14} CCI argues the trial court erred in finding that GE properly exercised its chargeback remedy when the evidence demonstrated that GE failed to satisfy its corresponding contractual obligation to tender to CCI its rights under the loan agreements. CCI contends GE was in possession of funds due and owing to it on unrelated credit memos. GE then exercised its chargeback remedy by taking these funds. CCI contends that pursuant to the dealership agreements, GE was required to

tender the corresponding consumer loan agreements to it. Doing so, CCI asserts, would enable it to collect the money from the consumer instead of GE being able to collect it. CCI contends GE admitted twice at trial that in exercising its chargeback right, it was required to tender to CCI all of its rights under the consumer loan agreements within a reasonable time after the funds were received. It asserts GE also admitted that it did not tender the consumer loan agreements to CCI. For this reason, CCI argues GE's chargebacks were not valid. CCI also takes issue with the magistrate's and trial court's decisions because it asserts they did not address this argument.

**{¶15}** When reviewing civil appeals from bench trials, an appellate court applies a manifest-weight standard of review. *Revilo Tyluka, L.L.C. v. Simon Roofing & Sheet Metal Corp.,* 193 Ohio App.3d 535, 538-539, 952 N.E.2d 1181 (8 Dist.2011), citing App.R. 12(C), *Seasons Coal v. Cleveland* (1984), 10 Ohio St.3d 77, 461 N.E.2d 1273. Judgments supported by some competent, credible evidence going to all the material elements of the case must not be reversed, as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus (1978). See, also, *Gerijo, Inc. v. Fairfield*, 70 Ohio St.3d 223, 226, 638 N.E.2d 533 (1994). Reviewing courts must oblige every reasonable presumption in favor of the lower court's judgment and finding of facts. *Gerijo*, 70 Ohio St.3d at 226 (citing *Seasons Coal Co.*, supra). In the event the evidence is susceptible to more than one interpretation, we must construe it consistently with the lower court's judgment. *Id.* In addition, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. *Kalain v. Smith*, 25 Ohio St.3d 157, 162, 495 N.E.2d 572 (1986). "A finding of an error of law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Seasons Coal*, 10 Ohio St.3d at 81.

**{¶16}** Initially, we note that the magistrate did address CCI's argument regarding whether GE breached the dealership agreements by failing to tender back to CCI the consumer loan agreements that corresponded to the chargebacks. The

magistrate found that CCI's claim for breach of contract failed because CCI failed to demonstrate by a preponderance of the evidence that it fulfilled its contractual obligations to GE under the dealership agreements. The magistrate found the evidence instead demonstrated that CCI breached several dealership agreement provisions. The magistrate went on to specifically find that CCI's claim that GE breached the dealership agreements "cannot succeed because it has failed to establish by a preponderance of the evidence that it fulfilled its contractual obligations to GEMB thereunder." (Mag. Decision p. 31). And the magistrate found that CCI's claim that GE breached the dealership agreements must also fail because CCI did not prove that GE did not fulfill its contractual obligations to CCI. (Mag. Decision p.31). Thus, CCI's claim that the magistrate/trial court failed to consider its argument is unsubstantiated.

{¶17} We must next examine the evidence to determine whether it supports the trial court's determination that GE properly exercised its chargeback rights.

{¶18} Relating to chargebacks, the Honda Card dealership agreement provided in pertinent part:

> In any of the following circumstances, Bank may charge back to Dealer any Memo that bank has accepted from Dealer, and Dealer shall immediately pay Bank the amount represented by the Memo, plus interest on the Memo accrued and unpaid as if the date of the chargeback, plus bank's out-of-pocket costs incurred, if any, in attempting to collect on the Memo, but less any acquisition charge previously paid by Dealer to Bank:
>
> * * *
>
> (ix) Bank determines that Dealer has violated or not complied with any term, condition, covenant, warranty, or other provision of this Agreement or any other agreement between the parties or any of Bank's procedures, in connection with the Memo or the transaction to which it relates; or

(x) Bank determines that the Memo is fraudulent or that the related transaction is not a bona fide transaction in Dealer's ordinary course of business, * * *.

(Ex. D-1, ¶8).

**{¶19}** One of the "Dealer Warranties" set out in the Honda Card dealership agreement is: "Dealer warrants * * * the goods or services covered by the Memo were purchased in a bona fide transaction with Dealer for consumer (personal, family, or household) purposes." (Ex. D-1, ¶7). And one of the "Dealer Covenants" provides that "Dealer shall * * * comply with all instructions or procedures provided by Bank * * * including, without limitations, instructions pertaining to the completion of Applications, Contracts, or Memos." (Ex. D-1, ¶10). Additionally, the Honda Card Quick Reference Guide provides that title applications listing GE as the lienholder are required on motorcycles and ATVs when the transaction is $5,000 or greater. (Ex. D-2).

**{¶20}** The FUNancing Card dealership agreement provides the following with respect to chargebacks. GE may chargeback the dealer in certain situations including (1) if "[a]ny of the representation or warranty made by Dealer pursuant to this Agreement proves to be false or inaccurate in any respect" or (2) if an account is opened not for the purpose of funding a bona fide purchase. (Ex. D-3, ¶¶2, 11). In the dealership agreement, the dealership warranted to GE that all facts set forth in sales documents of GE-financed products would be true, that the sales slips would be for bona fide consumer sales, and that the transactions would be in accordance with the applicable operating procedures. (Ex. D-3, ¶1).

**{¶21}** The Dealer Handbook for the FUNancing Card includes a sample sales slip and provides, "Funancing Card cannot be used for down payments." (Ex. D-4, p.12). The Handbook also explicitly provides that a lien is required "for each unit when financing $5,000.00 or more." (Ex. D-4, p.14). As to chargebacks, the Handbook states that chargebacks will only occur on unresolved disputes, not for customer non-payment. (Ex. D-4, p.24).

**{¶22}** The testimony at trial as to the chargebacks was as follows.

**{¶23}** Jason Severtson was the vice president of sales in GE's power sports division during the relevant time. Severtson stated that generally in a chargeback situation, GE first looks to see if there is a breach, then they conduct an internal investigation, then they inform the dealership what they have found and offer the dealership an opportunity to explain, and then they make the decision whether to chargeback. (Tr. 62). Severtson also defined a split-ticket as taking a single transaction and splitting it into two transactions. (Tr. 457). He stated that the motivation for split-tickets could be to obtain more credit or to avoid GE's lien requirement. (Tr. 458-459). He testified that GE did not permit split-ticketing. (Tr. 459). Severtson stated that dealers were aware that split-ticketing was not permitted because it is set out in the dealership agreements and accompanying documents. (Tr. 461).

**{¶24}** In this case, Severtson stated that GE was initially contacted by law enforcement regarding specific VIN numbers of power sports units. (Tr. 86). This caused GE to look into 17 accounts opened by nine individuals. (Tr. 514-515). Severtson testified in detail regarding each of the nine account holders and their 17 accounts. (Tr. 518-607). They all shared numerous "red flags" that they were not bona fide consumer sales including: the attention by law enforcement; a large number of sales in a short period of time all from the same buyers with 60-70 units purchased; the units had no liens recorded; many appeared to be split-ticket transactions; every one of the 17 accounts had multiple purchases, either on the same day or just days apart; and most of the accounts were first-payment or second-payment defaults. (Tr. 514-515; 6-7-608).

**{¶25}** Based on all of this information, Severtson stated that GE contacted Ed Hanson at CCI in September 2008, and was advised that CCI would look into the deals and get back to GE. (Tr. 633-634). He stated that GE also contacted one of CCI's owners, Russ Haehn, in October 2008, about the situation. (Tr. 654-655). Haehn also indicated that he would get back to GE. (Tr. 655-656). However,

Severtson stated that CCI failed to get back to GE. (Tr. 636, 657). After failing to get any response from CCI regarding a potential explanation for the accounts in question, on December 3, 2008, GE made the decision to chargeback CCI for the 17 accounts. (Tr. 661).

{¶26} Severtson was unsure why GE did not tender back the consumer contracts to CCI at the time. (Tr. 78). He stated that he left GE's power sports division in 2009. (Tr. 78). Therefore, he could not say why the consumer contracts were not tendered back and could not agree that GE breached its obligation to do so. (Tr. 78). He testified that he was not privileged to that information. (Tr. 701).

{¶27} Severtson's testimony and the dealership agreements are competent, credible evidence to support the trial court's decision that the chargebacks were permissible under the terms of the agreements. GE had information to believe that the sales on the accounts in question were not bona fide consumer sales as required by the dealership agreements. And according to Severtson, CCI was unwilling or unable to provide GE with an explanation to the contrary. Therefore, the trial court had competent, credible evidence to find that GE's chargebacks were permissible.

{¶28} Furthermore, the evidence did not necessarily indicate, as CCI suggests, that GE breached the terms of the dealership agreements by failing to tender back to CCI the consumer sales contracts on which GE issued the chargebacks. While many witnesses testified at trial, Severtson was the only witness as to this issue. Severtson did state that under the terms of the dealership agreements GE was to tender the consumer contracts back to the dealership. But Severtson stated that he was unsure of/ unprivileged to the reasons why GE may not have tendered the consumer loan contracts to CCI.

{¶29} In this case, the trial court found that CCI's claim that GE breached the dealership agreements must fail because CCI failed to establish that it fulfilled its obligations to GE. To prevail on a claim for breach of contract, the plaintiff must prove, by a preponderance of the evidence that: (1) a contract existed, (2) the plaintiff fulfilled its contractual obligations, (3) the defendant failed to fulfill its obligations, and

(4) the plaintiff incurred damages as a result of this failure. *Langfan v. Carlton Gardens Co.*, 183 Ohio App.3d 260, 2009-Ohio-3318, 916 N.E.2d, ¶25 (3d Dist.). Thus, because CCI could not prove that it fulfilled its contractual obligations, it could not sustain its burden on its claim that GE breached the dealership agreements.

**{¶30}** Accordingly, CCI's first and second assignments of error are without merit.

**{¶31}** CCI's third assignment of error states:

> THE TRIAL COURT ERRED IN FINDING THAT GE MONEYBANK LAWFULLY EXERCISED ITS CHARGE-BACK RIGHTS WHEN THE UNDISPUTED EVIDENCE DEMONSTRATES THAT GE MONEYBANK REPRESENTATIVES ENCOURAGED AND AUTHORIZED THE "SPLIT TICKET" TRANSACTIONS.

**{¶32}** Here, CCI argues that the evidence demonstrated that GE breached its duty of good faith and fair dealing by authorizing CCI to utilize split-ticket transactions and then using the chargeback remedy because CCI used split-ticketing. CCI acknowledges that the dealership agreements prohibit split-ticket transactions. However, it argues the evidence established that split-ticket transactions are an established industry practice that was permitted and encouraged by GE. CCI asserts that GE failed to present any evidence to the contrary. Therefore, CCI argues, the use of split-ticket transactions was not a proper basis for the chargebacks.

**{¶33}** The evidence on the issue of whether GE permitted split-ticketing was "split." GE presented evidence that split-ticketing was completely prohibited, while CCI presented evidence that although the dealership agreements prohibited split-ticketing, the practice was encouraged by GE to boost sales. The witnesses on the subject testified as follows.

**{¶34}** Joshua Smiley, a general manager in the power sports industry, testified that split-ticketing was a common practice in the industry. (Tr. 14-16).

**{¶35}** Robert Ritchie, another general manager in the power sports industry,

also testified that split-ticketing was common in the industry. (Tr. 32-33).

**{¶36}** Ed Hanson was CCI's finance director during the relevant time. Hanson testified that CCI's GE sales representative, Greg Mallin, came to CCI and instructed him on how to use "swipes" for miscellaneous purchases up to $3,000 on all GE revolving accounts, including the Honda Card and the FUNancing Card. (Tr. 149-151). Hanson stated that he asked Mallin if CCI could use a swipe for a down payment and then finance the rest of a power sports vehicle purchase on another GE card and Mallin told him there was no problem with this split-ticketing. (Tr. 157-158). Hanson stated that he questioned Greg Funk, a higher-up at GE, about the swipes and split-ticketing and was told that these procedures were permitted. (Tr. 161). Hanson did state however, that he never received a memo documenting these procedures. (Tr. 162). Hanson stated that CCI began using the swipes and split-tickets for 40 to 60 sales per month. (Tr. 162-163).

**{¶37}** Hanson stated that this practice continued until early August 2008, when CCI experienced funding delays. (Tr. 174). Around that time, Hanson stated that Funk called him and told him that split-ticket transactions would no longer be funded. (Tr. 174-175). Consequently, Hanson stated that he informed the staff at CCI to cease the split-ticketing. (Tr. 176).

**{¶38}** Russ Haehn testified that in 2007 he and Hanson had a meeting with Mallin at CCI where Mallin informed them that they could use the credit card swipes for down payments. (Tr. 268-269). Haehn stated that he specifically asked Mallin if CCI could use a swipe to get the transaction under $5,000 to avoid the lien requirement and Mallin informed him that this was permissible. (Tr. 271). Haehn went on to testify that in August 2008, he received a letter from GE reminding him that split-ticketing was a violation of the dealership agreements. (Tr. 282; Ex. O). At that point, Haehn stated, CCI ceased doing split-ticket sales. (Tr. 284).

**{¶39}** Severtson testified that GE did not allow split-ticketing. (Tr. 459). He stated that one reason GE did not permit split-ticketing was because GE would not get liens on the vehicles. (Tr. 460). Therefore, Severtson stated, the consumer

could take their title free and clear and sell or trade the vehicle and have no incentive to pay GE. (Tr. 460). GE would then have no right to go after the vehicle as collateral. (Tr. 460). Severtson testified that the dealership agreements prohibited split-ticketing. (Tr. 461).

**{¶40}** The dealership agreements gave support to Severtson's testimony. The FUNancing Card Handbook specifically states that the card cannot be used for down payments. (Ex. D-4, p.12). And it provides that a lien is required "for each unit when financing $5,000.00 or more." (Ex. D-4, p.14). And the Honda Card Quick Reference Guide provides that when the sale of a motorcycle or ATV is $5,000 or greater, GE must be listed as the lienholder. (Ex. D-2).

**{¶41}** As can be seen from the above-cited testimony and the dealership agreements, the issue of whether GE permitted split-ticketing could have been decided either way. Which witnesses to believe was a credibility determination. The magistrate was in the best position to make this credibility determination as it was the magistrate who was able to observe the witnesses' demeanor, gestures, and voice inflections, and use these observations in weighing their credibility. *Seasons Coal Co.*, 10 Ohio St.3d at 80. Furthermore, the dealership agreements supported the testimony that split-tickets were prohibited.

**{¶42}** Because the evidence on this issue was susceptible to more than one interpretation, this court is bound to construe it consistently with the trial court's judgment. *Gerijo*, 70 Ohio St.3d at 226. And the magistrate/trial court found that GE does not allow split-ticketing because it is a way to avoid GE's lien requirement and requires the dealership to submit sales slips and credit memos to GE that do not reflect the true sale terms. (Mag. Decision ¶64). Since there is competent, credible evidence to support the trial court's determination on this issue, we are obligated to defer to the trial court.

**{¶43}** Accordingly, CCI's third assignment of error is without merit.

**{¶44}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Vukovich, J., concurs.

Waite, .J., concurs.